Slip Op. 20-138

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TAIZHOU UNITED IMP. & EXP. CO. LTD.,<br><br>          Plaintiff,<br><br>    and<br><br>GUANGZHOU JANGHO CURTAIN WALL SYSTEM ENGINEERING CO., LTD., JANGHO GROUP CO., LTD., BEIJING JIANGHEYUAN HOLDING CO., LTD., BEIJING JANGHO CURTAIN WALL SYSTEM ENGINEERING CO., LTD., JANGHO CURTAIN WALL HONG KONG LTD., SHANGHAI JANGHO CURTAIN WALL SYSTEM ENGINEERING CO., LTD.,<br><br>          Consolidated Plaintiffs,<br>    v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>    and<br><br>ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,<br><br>          Defendant-Intervenor. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 16-00009 |

**OPINION and ORDER**

[Final Results sustained in part and remanded in part.]

Dated: September 25, 2020

    Douglas J. Heffner and Richard P. Ferrin, Drinker Biddle & Reath LLP of Washington, DC, for Plaintiff Taizhou United Imp. & Exp. Co. Ltd.

James Kevin Horgan, Alexandra H. Salzman, Gregory Stephen Menegaz, and John Joseph Kenkel, deKieffer & Horgan, PLLC of Washington, DC, for Consolidated Plaintiffs Guangzhou Jangho Curtain Wall System Engineering Co., Ltd., Jangho Group Co., Ltd., Beijing Jiangheyuan Holding Co., Ltd., Beijing Jangho Curtain Wall System Engineering Co., Ltd., Jangho Curtain Wall Hong Kong Ltd. and Shanghai Jangho Curtain Wall System Engineering Co., Ltd.

Douglas G. Edelschick, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC, for Defendant United States. With him on the brief were Jeffrey Bossert Clarke, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades Jr., Assistant Director. Of counsel on the brief was Kirrin Hough, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Alan H. Price, Robert E. DeFrancesco, III, and Elizabeth S. Lee, Wiley Rein LLP of Washington, DC, for Defendant-Intervenors Aluminum Extrusions Fair Trade Committee.

Gordon, Judge: This action involves the final results of the 2013 administrative review conducted by the U.S. Department of Commerce ("Commerce") of the countervailing duty ("CVD") order on aluminum extrusions from the People's Republic of China ("PRC"). See Aluminum Extrusions From the People's Republic of China, 80 Fed. Reg. 77,325 (Dep't of Commerce Dec. 14, 2015) (final results admin. rev.) ("Final Results"); see also accompanying Issues and Decision Memorandum, C-570-968 (Dep't of Commerce Dec. 7, 2015), available at https://enforcement.trade.gov/frn/summary/prc/2015-31425-1.pdf ("Decision Memorandum"); Aluminum Extrusions from the People's Republic of China, 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011) ("CVD Order").

Before the court are the USCIT Rule 56.2 motions for judgment on the agency record filed by Plaintiff Taizhou United Imp. & Exp. Co. Ltd. ("Taizhou") and Consolidated

Plaintiffs Guangzhou Jangho Curtain Wall System Engineering Co., Ltd., Jangho Group Co., Ltd., Beijing Jiangheyuan Holding Co., Ltd., Beijing Jangho Curtain Wall System Engineering Co., Ltd., and Shanghai Jangho Curtain Wall System Engineering Co., Ltd. (collectively, "Jangho"). See Pl.'s Mem. in Supp. of its 56.2 Mot. for J. on the Agency R., ECF No. 80; Consolidated Pl's Mem. In Supp. of its Mot. For J. on the Agency R., ECF No. 82-1 ("Jangho Br."); see also Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 88 ("Def.'s Resp."); Def.-Intervenors' Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 89; Pl. Taizhou's Reply Br., ECF No. 92; Consolidated Pls.' Reply Br., ECF No. 93 ("Jangho Reply").[1] The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii)[2], and 28 U.S.C. § 1581(c) (2012).  For the reasons set forth below, the court grants Plaintiffs' motions as to Commerce's determinations to countervail subsidized purchases of glass and aluminum extrusions, and remands the Final Results to Commerce; however, the court sustains the Final Results as to all other issues raised by Plaintiffs.

---

[1] In July 2020, approximately three months after the conclusion of briefing the USCIT Rule 56.2 motion for judgment on the agency record, Jangho replaced their former counsel at Sandler, Travis & Rosenberg, PA with their current counsel. See ECF No. 96 (Form 12 Substitution of Attorney filed by J. Kevin Horgan to appear in place of Kristen S. Smith).

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

## I.     Background

Initially, Plaintiffs' claims included challenges to whether their products fell within the scope of the <u>CVD Order</u>. <u>See</u> Mem. In Supp. of Jangho's Mot. for J. on the Agency R. at 11–24, ECF No. 47. To promote judicial efficiency, the court stayed briefing in this action pending the resolution of <u>Guangzhou Jangho Wall Sys. Eng'g Co. v. United States</u>, Court Nos. 15-00023 & 15-00024, which involved identical challenges to the scope of Commerce's antidumping ("AD") and CVD Orders arising out of the second administrative review. <u>See</u> Order Granting Stay, ECF No. 63.

Under 19 C.F.R. § 351.225, an interested party may apply for a ruling from Commerce as to whether a particular product is within the scope of a CVD order. <u>See</u> 19 C.F.R. § 351.225. Yuanda USA Corporation and Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. (collectively "Yuanda") requested a scope inquiry for its curtain wall units produced in the PRC, and Commerce issued a formal scope ruling that Yuanda's curtain wall units fell within the scope of the order. <u>See</u> <u>Aluminum Extrusions from the PRC</u>, A-570-967 & C-570-968 (Dep't of Commerce Mar. 27, 2014) (final scope ruling on curtain wall units produced and imported pursuant to contract to supply curtain wall), <u>available at</u> https://enforcement.trade.gov/download/prc-ae/scope/38-curtain-wall-units-7apr14.pdf ("Yuanda Scope Ruling").

Yuanda, and other foreign producers/exporters and importers of substantially identical curtain wall units (including Jangho), challenged the Yuanda Scope Ruling before this Court and the U.S. Court of Appeals for the Federal Circuit. <u>See</u> <u>Shenyang</u>

<u>Yuanda Aluminum Eng'g Co. v. United States</u>, 41 CIT ___, 279 F. Supp. 3d 1209 (2017),

<u>aff'd</u>, 918 F.3d 1355 (Fed. Cir. 2019). In sustaining the Yuanda Scope Ruling, the Federal

Circuit held that "curtain wall units . . . imported under a contract for an entire curtain wall"

are within the scope of the AD and CVD orders covering aluminum extrusions from the

PRC. <u>See</u> <u>Shenyang Yuanda</u>, 918 F.3d at 1358, 1368. Following the Federal Circuit's

decision in <u>Shenyang Yuanda</u>, Plaintiffs sought and obtained voluntary dismissals of their

complaints in Court Nos. 15-00023 & 15-00024. <u>See</u> Order of Dismissal under USCIT

R. 41(a)(1)(A)(ii), Court No. 15-00023, ECF No. 85; Order of Dismissal under USCIT

R. 41(a)(1)(A)(ii), Court No. 15-00024, ECF No. 83. In this action, Plaintiffs withdrew their

arguments related to scope, filed amended complaints, and the instant USCIT Rule 56.2

motions for judgment on the agency record. <u>See</u> Joint Status Report & Proposed Briefing

Schedule at 2, ECF No. 72.

Plaintiffs challenge various aspects of Commerce's determinations in the <u>Final</u>

<u>Results</u>. First, Plaintiffs contend that Commerce unlawfully suspended Plaintiffs' entries

of subject merchandise prior to Commerce's initiation of a formal scope inquiry.  <u>See</u>

Jangho Br. at 9. Plaintiffs also contend that Commerce unreasonably found that they

benefitted from countervailable subsidies in the form of various preferential loans, tax

policies, and tax offsets. <u>Id.</u> at 16–20. Plaintiffs further argue that Commerce

unreasonably determined that glass and aluminum extrusions purchased for less than

adequate remuneration ("LTAR") may be countervailed as inputs to the subject

merchandise. <u>Id.</u> at 20–28. Alternatively, Plaintiffs maintain that even if Commerce may

lawfully countervail glass and aluminum extrusion inputs to the subject merchandise, "the administrative record provides no support for Commerce's arbitrary finding that suppliers are 'government entities,' that a benefit was indeed provided or that any alleged benefit was specific in nature, as required by the CVD statute." Id. at 28–38.

## II.    Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and

Practice § 9.24[1] (3d ed. 2020). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2020).

### III.     Discussion

### A.     Countervailing Duty of Aluminum Extrusions and Glass "Inputs" in Subject Merchandise

Plaintiffs argue that Commerce lacks the authority to countervail subsidies to glass and aluminum extrusions as "inputs" to the subject merchandise. See Jangho Br. at 20-28. With respect to Commerce's decision to countervail glass subsidies, Plaintiffs argue that glass is outside of the scope of the CVD Order. Id. at 22. Plaintiffs highlight that the language of the CVD Order expressly excludes from the scope of the order "the non-aluminum extrusion components of subassemblies or subject kits." Id. at 24 (quoting CVD Order, 76 Fed. Reg. at 30,653–54).  Plaintiffs also contend Commerce lacked the authority to countervail aluminum extrusions. Id. at 27. Plaintiffs argue that aluminum extrusions may not be countervailed because aluminum extrusions are the subject merchandise, not an input used in the manufacture of subject merchandise. Id. Plaintiffs note that although Commerce found that curtain wall units are subject to the scope of the order in Yuanda Scope Ruling, only the aluminum extrusions contained in curtain wall units constitute subject merchandise. Id. at 28.

Consol. Court No. 16-00009                                                        Page 8

Commerce found that parts of curtain walls, including curtain wall units, are included within the scope of the order. See Decision Memorandum at 96. Commerce does not dispute that it generally does not countervail subsidies tied to non-subject merchandise. Id. at 97. However, Commerce rejected Plaintiffs' arguments that glass is outside of the scope of the CVD Order, explaining:

> curtain wall units such as those produced by the Jangho Companies are considered subject merchandise. In other words, subject curtain wall units containing glass is a single commercial product. Glass is therefore an input used in the manufacture of subject merchandise, i.e., curtain wall units.

Id. at 97–98. Commerce thus found that it could countervail subsidies to glass inputs of curtain wall units, as the benefits derived from the purchase of glass for LTAR are tied to subject merchandise. Id.

Curtain wall units are subassemblies of curtain walls. See Shenyang Yuanda Aluminum Eng'g Co. v. United States, 918 F.3d 1355, 1367 (Fed. Cir. 2019) ("The only remaining issue for the curtain wall unit entries at issue here is whether they are excluded when viewed (correctly) as subassemblies. We see no error in Commerce's conclusion that they are not so excluded."); see also Shenyang Yuanda Aluminum Eng'g Co. v. United States, 776 F.3d 1351, 1358 (Fed. Cir. 2015) ("curtain wall units are undeniably components that are fastened together to form a completed curtain wall. Thus, they are 'parts for,' and 'subassemblies' for, completed curtain walls. A part or subassembly, here a curtain wall unit, cannot be a finished product." (internal citation and quotation omitted)).

As subassemblies, curtain wall units are subject to the exclusion of their non-aluminum extrusion components from the order: "The scope does not include the non-aluminum extrusion components of subassemblies." CVD Order, 76 Fed. Reg. at 30,654. Commerce's conclusion that "a curtain wall unit is subject merchandise, inclusive of aluminum extrusions, glass, and all other components" unreasonably contravenes the plain language of the order. See Decision Memorandum at 100. The scope of the order covers aluminum extrusions, not glass, and the CVD Order expressly excludes the non-aluminum extrusion components of subassemblies like curtain wall units. It is therefore arbitrary to conclude the glass is subject merchandise. By the scope's definition, it is not. This is not arguable or subject to interpretation. The scope is clear. Commerce must abide by the clear scope language. The court will therefore remand this issue for Commerce to correct its analysis of the non-aluminum extrusion components of the curtain wall units. Those are not subject merchandise.

The more interesting question is Commerce's treatment of the aluminum extrusions component of the curtain wall units. Commerce countervailed the aluminum extrusion component as an input of the curtain wall unit. Id. That has a facial appeal if one erroneously concludes the subject merchandise is the curtain wall unit. The subject merchandise, however, is the aluminum extrusion component of the curtain wall units. To be clear, the subject merchandise is a curtain wall unit, which is a subassembly of a curtain wall, and does not include the non-aluminum extrusion components, which leaves, unsurprisingly, aluminum extrusions. It does ring pretty hollow to conclude that aluminum

extrusions are inputs for aluminum extrusions. The court cannot sustain that as reasonable. Commerce therefore needs to rethink its treatment of the aluminum extrusions in the curtain wall units, and how best to fully capture their subsidization. The court does understand that it is possible to subsidize the aluminum extrusions as an input for the curtain wall unit, and separately subsidize the curtain wall units. It is also possible in that scenario to double count the aluminum extrusion subsidies and overcompensate on the trade remedy. The hope is that on remand, Commerce can sort this out and determine the appropriate countervailable measures for the subject merchandise, aluminum extrusions.

### B.     Statutory Requirements for Countervailing Subsidies for Aluminum Extrusions and Glass

Because the court remands Commerce's determination that it may countervail glass and aluminum extrusions as inputs to the subject merchandise, see Section A supra, the court does not reach Plaintiffs' alternative arguments as to whether Commerce reasonably found that the statutory requirements of § 1677(5) were met with respect to Plaintiffs' aluminum extrusion and glass purchases. See Jangho Br. at 28–38.

### C.     Suspension of Plaintiffs' Entries and Application of 19 C.F.R. § 351.225

19 C.F.R. § 351.225 "contains rules regarding scope rulings, requests for scope rulings, procedures for scope inquiries, and standards used in determining whether a product is within the scope of an order or suspended investigation." See 19 C.F.R.

§ 351.225(a). Plaintiffs contend that the suspension of liquidation of their entries in this matter violated § 351.225(l)(3), which provides:

> If the Secretary issues a final scope ruling, under either paragraph (d) or (f)(4) of this section, to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this section will continue. Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary's final scope ruling is to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the subject product ended and will instruct the Customs Service to refund any cash deposits or release any bonds relating to this product.

19 C.F.R. § 351.225(l)(3).

Plaintiff argues that "[b]ecause Commerce did not suspend liquidation of 'curtain wall units that are produced and imported pursuant to a contract to supply a curtain wall' prior to the initiation of the formal scope inquiry, entries of those products cannot be suspended retroactively before that date" pursuant to this regulation. See Jangho Br. at 9–15. Plaintiffs note that Commerce's liquidation instructions in the Yuanda Scope Ruling specifically directed U.S. Customs and Border Protection ("Customs" or "CBP") to "suspend liquidation of entries of curtain wall units that are produced and imported pursuant to a contract to supply a curtain wall effective 5/10/2013, which is the date of the initiation of the scope inquiry". Id. at 10. Plaintiffs maintain that based on these

instructions, entries of curtain wall units prior to May 10, 2013 should be excluded from suspension in the underlying administrative review. Id.

Commerce found the regulation was not applicable to the subject merchandise and rejected Plaintiffs' argument. See Decision Memorandum at 78–80. Specifically, Commerce noted that Plaintiffs' recitation of § 351.225(l)(3) omitted the key words "[w]here there has been no suspension of liquidation." Id. at 79. Commerce explained that "[t]he Jangho Companies' relevant entries were suspended prior to the date of initiation of the curtain wall units scope ruling," and the agency thus concluded that "[n]othing in 19 CFR 351.225(l)(3) prohibits CBP from suspending liquidation of these entries prior to the initiation of a scope inquiry." Id. Commerce thus concluded that, contrary to Plaintiffs' arguments, "the Department has not retroactively ordered the suspension of liquidation of any entries of the Jangho Companies' merchandise, although such merchandise may already have been properly suspended by CBP. … [T]he in-scope status of the Jangho Companies' curtain wall units and other curtain wall components and products subject to this review has been confirmed by the Department's scope ruling, by the CIT, and by the Federal Circuit in Shenyang Yuanda v. United States." Id. at 79–80. Accordingly, Commerce determined that the continued suspension of liquidation of the subject merchandise was proper. Id.

Plaintiffs argue that Commerce's interpretation of § 351.225(l)(3) is too simplistic, and that the existence of a pre-existing administrative review "does not free Commerce from adhering to the Yuanda Scope Ruling." Id. at 13.   Plaintiffs contend that

§ 351.225(l)(3) limits when Commerce can suspend liquidation of entries that were subject to a final scope ruling. Id. at 13–14.

Commerce explained that "suspension of entries of curtain wall parts began at the date of the preliminary determination in the countervailing duty investigation and properly continued through the completion of the relevant scope inquiry on curtain wall units pursuant to 19 C.F.R. § 351.225(l)(1) and (3)." See Decision Memorandum at 80. Commerce disagreed with Plaintiffs' contention that the agency "retroactively assessed duties on Jangho's entries," and explained that "curtain wall parts are, and always have been, subject to the CVD order." Id. (citing Aluminum Extrusions from the People's Republic of China, 75 Fed. Reg. 54,302, 54,303 (Dep't of Commerce Sept. 7, 2010) (prelim. determ. CVD investigation) ("Preliminary Determination")). Commerce emphasized the limiting language, "[w]here there has been no suspension of liquidation," in § 351.225(l)(3), and determined that the regulation did not limit Commerce's authority to suspend liquidation of Plaintiffs' entries. Id.

The court agrees with Commerce that the agency's suspension of liquidation of Plaintiffs' entries did not violate § 351.225(l)(3) for the reasons provided in the Decision Memorandum. Plaintiffs' arguments focusing on the language of Commerce's liquidation instructions and highlighting precedent where Commerce was not permitted to retroactively suspend liquidation of entries, see Jangho Br. at 11–12, ignore the crucial distinguishing fact in this matter that Plaintiffs' entries were lawfully suspended pursuant to the Preliminary Determination prior to the May 2013 Yuanda Scope Ruling.

See Decision Memorandum at 79–80. The court agrees that because Plaintiffs' entries were already lawfully suspended at the time of the Yuanda Scope Ruling, § 351.225(l)(3) did not limit the Government's authority to continue suspending those entries. Accordingly, the court rejects Plaintiffs' arguments that the suspension of liquidation of entries of subject merchandise prior to the issuance of the Yuanda Scope Ruling violated § 351.225(l)(3).

### D.      Application of 19 U.S.C. § 1677(5)(B) to PRC Banks

Under 19 U.S.C. § 1677(5) there are four requirements that Commerce must find in order to determine that a foreign program constitutes a countervailable subsidy. Specifically, in order to find a "subsidy" Commerce must find that an "authority" provided a "financial contribution" in which a "benefit" is conferred. See 19 U.S.C. § 1677(5). Each of these terms is defined in the statute. See 19 U.S.C. § 1677(5)(B)(iii) (defining "authority"); 19 U.S.C. § 1677(5)(D) (defining "financial contribution"); 19 U.S.C. § 1677(5)(E) (defining when a "benefit" is "conferred"). Additionally, in order for a subsidy to be countervailable under the statute, Commerce must find that the subsidy is "specific" under the criteria set forth in § 1677(5A).

Plaintiffs contend that Commerce erroneously found that PRC banks constitute "authorities" as defined in § 1677(5)(B)(iii). Jangho Br. at 16–19. Plaintiffs maintain that "the underlying administrative record demonstrates that banks made lending decisions based upon sound commercial considerations, not government policy goals." Id. at 16. Jangho argues that Chinese banks operate based on rules and regulations that require

them to make decisions based on commercial considerations. Id. (referencing the Interim Measures for the Administration of Working Capital Loans ("Interim Measures")).  Jangho highlights the Government of China's ("GOC") questionnaire response that states that it is an "explicit requirement of Interim Measures that the issuance of working capital loans shall be prudently decided by banks based on a reasonable estimation of the borrower's working capital demand and fair consideration of cash flow, liabilities, repayment ability, guarantee status and other factors of the borrower."  Id. at 16–17.

Commerce continued to find, "as it has in prior segments of this proceeding, that the GOC had a policy in place to encourage the development of the production of aluminum extrusions through policy lending, and that Chinese [state-owned commercial banks ("SOCBs")] are authorities under the countervailing duty law." See Decision Memorandum at 83. Commerce explained that "[i]n the Aluminum Extrusions from the PRC Investigation, Aluminum Extrusions from the PRC First Review, and Aluminum Extrusions from the PRC Second Review, we determined that the GOC had a policy in place to encourage the development of the production of aluminum extrusions through policy lending. In the instant administrative review, the GOC's discussions of the lending practices of financial institutions echoed the discussion in previous administrative reviews." Id. at 43. Commerce also relied on its finding in Coated Free Sheets Paper from the People's Republic of China ("CFS from the PRC"): "that the PRC's banking sector does not operate on a commercial basis and is subject to significant distortions, primarily arising out of the continued dominant role of the government in the financial system and

the government's use of banks to effectuate policy objectives." Id. (quoting  CFS from the

PRC, 72 Fed. Reg. 60,645 (Dep't of Commerce Oct. 25, 2007) (final affirmative CVD

determ.)). Commerce explained that it found Chinese SOCBs to be "authorities" within

the meaning of § 1677(5)(B)(iii), and further noted that this finding was not based on

"government ownership alone." Id. at 84 (quoting from CFS from the PRC that

"information on the record indicates that the PRC's banking system remains under State

control and continues to suffer from the legacies associated with the longstanding pursuit

of government policy objectives. These factors undermine the SOCBs ability to act on a

commercial basis and allow for continued government control resulting in the allocation

of credit in accordance with government policies. Therefore, treatment of SOCBs in China

as commercial banks is not warranted in this case."). Commerce explained that "[i]n order

to revisit the determination in CFS from the PRC, there must be evidence warranting

reconsideration," and found that "there is no such evidence on the record of this

administrative review." Id.

        Commerce rejected Plaintiffs' arguments based on the Interim Measures, noting

that it had previously considered the impact of these measures with respect to similar

arguments made in "Aluminum Extrusions from the PRC First Review and determined

that there is no basis to conclude that the GOC's policy lending activities ceased with the

issuance of the Interim Measures." Id. at 44. Specifically, Commerce highlighted that

"Article 34 of the [Law of the People's Republic of China on Commercial Banks ("Banking

Law")] states that banks should carry out their loan business 'under the guidance of the

state industrial policies.'" Id. Commerce explained its determination that "[i]n the instant review, because the Interim Measures are 'fully consistent' with the Banking Law, we determine, consistent with prior determinations, that they do not constitute evidence that the GOC ceased policy lending to the aluminum extrusions industry, despite any changes to lending practices asserted by the GOC." Id. Commerce therefore concluded that "loans to aluminum extrusion producers from SOCBs and policy banks in the PRC were made pursuant to government directives and, thus, constitute a direct financial contribution from 'authorities,'" pursuant to § 1677(5A)(D)(i). Id.

While Plaintiffs would prefer that Commerce consider the language of the Interim Measures in isolation and draw an inference that Chinese SOCBs operate according to commercial principles without regard to state policy, Plaintiffs have failed to demonstrate that their position is the one and only reasonable conclusion that Commerce could reach on the record. See Tianjin Wanhua Co. v. United States, 40 CIT ___, ___, 179 F. Supp. 3d 1062, 1071 (2016); Globe Metallurgical, Inc. v. United States, 36 CIT ___, ___, 865 F. Supp. 2d 1269, 1276 (2012) (substantial evidence review "contemplates [that] more than one reasonable outcome is possible on a given administrative record"). Accordingly, the court sustains Commerce's determination that Plaintiffs' received countervailable policy loans.

E.    **Specificity of Tax Policies for High or New Technology Enterprises and Tax Offsets for Research and Development Under 19 U.S.C. § 1677(5A)**

A subsidy is specific as a matter of law "[w]here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i). Commerce determined that Preferential Tax Policies for High or New Technology Enterprises ("HTNEs"), as well as the Tax Offsets for Research and Development ("R&D") Program, are specific as a matter of law under 19 U.S.C. § 1677(5A)(D)(i). See Decision Memorandum at 88–93. Plaintiffs challenge Commerce's findings of de jure specificity with respect to both programs. See Jangho Br. at 19–20.

Plaintiffs contend that the HTNE policies apply to a number of different industries such that Commerce could not reasonably conclude that "the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." Id. at 19 (citing 19 U.S.C. § 1677(5A)(D)(i)). In support of their argument, Plaintiffs point to the annex of the Measures of Recognition of HTNEs, a list comprised of eight high and new technology areas that qualify for support under Article 28.2 of the PRC's Regulations on Implementation of the Enterprise Income Tax Law. Id. Plaintiffs argue that because each category is further broken down into 39 sub-areas, and more than 200 specific areas, the HTNE tax policies apply to various different industries and therefore are not specific under § 1677(5A)(D)(i). Id.

Commerce disagreed and determined that the HTNE tax program is de jure specific in accordance with 19 U.S.C. § 1677(5)(D)(i) because the qualifying industries are limited to eight specified industries. See Decision Memorandum at 89. Commerce relied on its finding in a previous proceeding evaluating the same HTNE tax program that "the reduction afforded by this program is limited as a matter of law to certain new and high technology companies selected by the government pursuant to legal guidelines specified in Measures on Recognition of HNTEs, and, hence, is specific under section 771(5A)(D)(i) of the Act." Id. (referencing Citric Acid and Certain Citrate Salts From the People's Republic of China, 76 Fed. Reg. 77,206 (Dep't of Commerce Dec. 12, 2011) (CVD review final results) ("Citric Acid and Certain Citrate Salts From the PRC"). Commerce further found that "[b]oth the number of targeted industries (eight) and the narrowness of the identified project areas under those industries support a finding that the legislation expressly limits access to the program to a specific group of enterprises or industries." Id. Commerce found no new information on the record of this proceeding that called into question its prior finding of specificity as to the HTNE tax program. Id. Commerce noted that in its initial questionnaire, Commerce provided the opportunity for the GOC to report any changes to programs that Commerce had previously evaluated. Id. at 90. GOC responded that there were no changes during the POR to the HTNE tax program. Id.

Commerce's conclusion that the HTNE tax program was "specific" under § 1677(5A)(D)(i) was reasonable. Commerce relied on undisputed evidence in the record,

as well as its past findings analyzing the same programs in prior segments of this proceeding and other proceedings, to determine that the HTNE tax program was expressly limited by legislation to be available to only to eight specified industries. The fact that those industries can be further subdivided into various sub-categories does not establish that Commerce's specificity finding under § 1677(5A)(D)(i) was unreasonable.

With respect to Commerce's finding of de jure specificity under § 1677(5A)(D)(i) as to the tax offset for R&D, Plaintiffs similarly contend that this finding was unreasonable. See Jangho Br. at 20. Specifically, Plaintiffs provide a three-sentence argument that "Commerce points to no evidence on the administrative record that such a policy exists for the POR. It does not. As explained by the GOC, there is no policy targeting the aluminum extrusions industry for development and assistance." Id. Plaintiffs provide no additional argument on this issue in their reply brief. See generally Jangho Reply.

Contrary to Plaintiffs' contentions, Commerce explained why its finding of specificity with respect to the R&D tax offset program was supported by the evidence in the record. See Decision Memorandum at 50 (noting that "The Program is administered pursuant to the 'Trial Administrative Measures for the Pre-Tax Deduction of Enterprises R&D Expenses' ("R&D Measures")", and that "Article 5 of the R&D Measures states that eligible R&D projects shall be in line with national and Guangdong provincial technological policies and industrial policies."). Commerce further explained that it had found that "the GOC has targeted the aluminum extrusions industry for development and assistance in a manner that is specific under [§ 1677(5A)(D)(i)], as illustrated in the government plans

and directives, to encourage and support the growth and development of the aluminum extrusions industry." Id. at 51. "Given this finding and in light of the language in Article 5 of the R&D Measures," Commerce "determined that tax reduction under this program are de jure specific within the meaning of [§ 1677(5A)(D)(i)]." Id. Moreover, Commerce noted that it had provided the GOC the opportunity to provide additional information with respect to the R&D tax offset program, and that the "GOC responded: 'There were no changes during the POR to this program.'" Id. at 93.

        In light of Commerce's findings and explanation, the court cannot see how it can conclude that Commerce's determination of specificity as to the R&D tax offset program was unreasonable, especially given Plaintiffs' barebones challenge. Accordingly, the court sustains Commerce's determinations that the HTNE and R&D tax programs were specific as a matter of law under § 1677(5A)(D)(i).

## IV.    Conclusion

        For the foregoing reasons, it is hereby

        **ORDERED** that this matter is remanded for Commerce to give effect to the CVD Order's language excluding "non-aluminum extrusion components of subassemblies" from the scope of the order; it is further

        **ORDERED** that on remand Commerce shall reconsider and further explain its countervailing of aluminum extrusion "inputs" to the subject merchandise; it is further

        **ORDERED** that all other challenged aspects of Commerce's Final Results are sustained; it is further

Consol. Court No. 16-00009                                                    Page 22

      **ORDERED** that Commerce shall file its remand results on or before November 24, 2020; and it is further

      **ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

 

 

                                                /s/ Leo M. Gordon
                                        Judge Leo M. Gordon

Dated: September 25, 2020
       New York, New York